**2022 UT 20**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

LUIS G. GAMEZ,
*Petitioner*,

*v.*

UTAH LABOR COMMISSION, B & S
CONSTRUCTION, and WORKERS
COMPENSATION FUND,[1]
*Respondents*.

No. 20200625
Heard September 17, 2021
Filed May 26, 2022

On Certification from the Court of Appeals

Attorneys:

Virginius Dabney, St. George, Stony V. Olsen, Moroni,
for petitioner

Floyd W. Holm, St. George, for respondents B & S Construction
and Workers Compensation Fund

Christopher C. Hill, Salt Lake City, for respondent
Utah Labor Commission

JUSTICE PETERSEN authored the opinion of the Court, in which
CHIEF JUSTICE DURRANT, ASSOCIATE CHIEF JUSTICE LEE, JUSTICE
HIMONAS[*], and JUSTICE PEARCE joined.

JUSTICE HAGEN became a member of the Court on May 18, 2022,
after oral argument in this matter, and accordingly did not
participate.

---

[1] Workers Compensation Fund is now known as WCF Mutual
Insurance Company.

[*] Justice Himonas sat on this case and voted prior to his
retirement on March 1, 2022.

JUSTICE PETERSEN, opinion of the Court:

## INTRODUCTION

¶1    Luis G. Gamez[2] sought workers' compensation benefits after he injured his left shoulder and low back in an industrial accident. Gamez's employer and its workers' compensation carrier accepted liability for Gamez's left-shoulder injury, but contested the compensability of his low-back injury. The administrative law judge (ALJ) assigned to the case appointed a medical panel to resolve the dispute. She appointed Dr. Jeremy Biggs, a board-certified occupational medicine physician, to serve as the panel chair. As chair, Dr. Biggs selected an orthopedic specialist to serve with him on the panel.

¶2    Gamez objected to the ALJ's appointment of Dr. Biggs and moved for interlocutory review of this decision. He argued that Dr. Biggs should be disqualified because he had a conflict of interest and because he did not specialize in low-back conditions. The Labor Commission Appeals Board (the Board) rejected Gamez's objections. It determined that Gamez had not made the requisite showing that Dr. Biggs had an "actual bias." And it concluded that Dr. Biggs could properly serve on the panel even if he was not a specialist because a medical panel need have only one member who specializes in the condition at issue, and that requirement was satisfied by the orthopedic specialist.

¶3    Ultimately, the medical panel concluded that the accident had temporarily aggravated Gamez's low back but had not caused permanent injury. The ALJ accepted the panel's conclusions. And the Board affirmed the ALJ's decision.

¶4    Gamez petitioned for review in the court of appeals, which certified the matter to us. Gamez argues that Dr. Biggs should have been disqualified from the medical panel due to a conflict of interest, and he asks us to overrule the "actual bias" standard used by the Board to evaluate such claims. Gamez also asserts that the Workers' Compensation Act requires all members

---

[2] Gamez's surname is listed on medical documentation, health insurance forms, and an accident report as "Gamez-Alvarez." However, he identified himself as "Luis G. Gamez" in his application for a hearing before the Labor Commission, and "Gamez" has been the surname used in subsequent proceedings.

of a medical panel to be specialists in the condition at issue, so Dr. Biggs also should have been removed from the panel because he does not specialize in low-back injuries. Finally, Gamez appeals the outcome of the Labor Commission proceeding, contesting the conclusion that his low back had "returned to baseline" when his back had never returned to the condition it was in prior to the accident.

¶5 We agree with the Board that the Workers' Compensation Act requires only one member of a medical panel to specialize in the condition at issue. So, even accepting Gamez's characterization of Dr. Biggs as a generalist who does not specialize in low-back injuries, this is not a basis to disqualify him from the medical panel here because there is no dispute that the other member of the panel qualifies as such a specialist.

¶6 However, we agree with Gamez that the actual bias standard applied by the Board to resolve his conflict-of-interest objection does not comport with the requirements of the statute. We hold that where a medical panelist's impartiality could reasonably be questioned, the requirement of an impartial medical evaluation has not been met. Accordingly, we reverse this portion of the Board's dismissal of Gamez's interlocutory objection. And we remand to the Board for reconsideration of this objection under this clarified legal standard.

¶7 Because we remand on this basis, we do not resolve Gamez's claim that Dr. Biggs had a conflict of interest or that the Board wrongly accepted the ALJ's conclusion that Gamez's low back had returned to baseline.

## BACKGROUND[3]

¶8 Gamez was injured in a rollover automobile accident while employed as a subcontractor for B & S Drywall, Inc. (B & S).[4] At the time of the accident, Workers Compensation Fund (WCF) served as the workers' compensation carrier for B & S.

---

[3] In reviewing a workers' compensation order from the Board, we "view the facts in the light most favorable to the Commission's findings and recite them accordingly." *Wright v. Labor Comm'n*, 2021 UT App 43, n.1, 489 P.3d 211 (citation omitted).

[4] B & S has consistently been referred to as "B & S Construction" and "B & S Construction Inc." throughout the

(continued . . .)

¶9     Gamez was initially treated in a hospital emergency room for injuries to his left shoulder, left ankle, and head. He later sought care for ongoing pain in his shoulder and low back.

¶10 Gamez subsequently pursued workers' compensation benefits—including permanent partial disability benefits and medical expenses—for the injuries to his left shoulder and low back. WCF accepted Gamez's shoulder-related claim but contested his low-back claim, arguing that he "suffered preexisting or independent medical problems that caused any disability" related to his low back.

¶11  Because of this dispute, the ALJ referred the matter to a medical panel. *See* UTAH ADMIN. CODE r. 602-2-2(A) (LexisNexis 2021) ("A panel will be utilized by the Administrative Law Judge where one or more significant medical issues may be involved.").[5] She appointed Dr. Jeremy Biggs, a board-certified occupational and environmental medicine physician, to serve as the panel chair.[6] Among other appointments, Dr. Biggs was affiliated with

_____

proceedings. However, the company's legal name is "B & S Drywall, Inc."

[5] "Generally a significant medical issue must be shown by conflicting medical reports." UTAH ADMIN. CODE r. 602-2-2(A) (LexisNexis 2021). In this case, Gamez's treating physician issued a report opining that Gamez's low-back symptoms were "primarily the result of the motor vehicle rollover" and that "any pre-existing condition would have been permanently aggravated" by the accident. He then assessed Gamez with a "7% whole-person impairment for his lumbar injury." A separate physician, engaged by WCF, opined to the contrary that the accident had neither medically caused nor further aggravated Gamez's low-back degeneration and assessed Gamez with a "7% whole-person impairment for [the injury to] his left shoulder" only.

[6] Occupational and Environmental Medicine (OEM) "is a board-certified specialty . . . that focuses on the diagnosis and treatment of work-related injuries and illnesses." *What is OEM?*, AM. COLL. OF OCCUPATIONAL & ENV'T. MED., http://acoem.org/Careers/What-Is-OEM (last visited Sept. 10, 2021). OEM physicians are "experts in the complex web of factors that affect health in the workplace" and help "enhance the health of workers through Clinical care, Prevention, Disability management, Research, [and] Education." *Id.*

the Rocky Mountain Center for Occupational and Environmental Health (RMCOEH).

¶12 The ALJ directed Dr. Biggs to select "specialists [he] deem[ed] appropriate" to assist in his evaluation of the claims related to Gamez's low back, noting that "Adjudication Division policy requires that medical panels have <u>at least two</u> members on them."

¶13 Gamez objected to the appointment of Dr. Biggs because he was not an orthopedic specialist, citing statutory language requiring a medical panel to "consist of one or more physicians specializing in the treatment of the disease or condition involved in the claim." UTAH CODE § 34A-2-601(1)(c). In response, WCF conceded that Dr. Biggs may not qualify as a low-back specialist for purposes of subsection (1)(c), but argued that the statute requires only one member of the medical panel to be a specialist, so Dr. Biggs need not be disqualified on this basis. WCF then requested the ALJ to "direct Dr. Biggs to appoint at least one of the other member(s) he selects to be board certified in orthopedics," rather than "extend[ing] to Dr. Biggs the discretion to select specialists that he 'deems appropriate.'"

¶14 In response, the ALJ clarified to Dr. Biggs that "[d]ue to the medical issues in this matter," he should "select an orthopedic specialist as a member of the panel." Dr. Biggs ultimately contracted with Dr. Michael Henrie to serve on the panel with him. Dr. Henrie was a Doctor of Osteopathic Medicine with board certification in physical medicine and rehabilitation, and a subspeciality board certification in sports medicine.[7]

¶15 Gamez then sought interlocutory review of the ALJ's interim order appointing the medical panel, contending that (1) Dr. Biggs was unqualified to serve on the panel because, by statute, all panelists must be experts in the medical subject matter at issue, and Dr. Biggs was not; and (2) Dr. Biggs's affiliation with RMCOEH presented a conflict of interest because WCF provides funding to RMCOEH.

¶16 The Board denied Gamez's motion for interlocutory review. With respect to his challenge to Dr. Biggs's qualification to

_____

[7] Neither party disputes that Dr. Henrie is a specialist in low-back injuries, the condition at issue here.

serve on the panel, it concluded that only "one panel member [need] have the requisite expertise in treating the injury or condition at issue." The Board noted that this has been standard practice "for many years" and remarked on the practical limitations of requiring "multiple physicians of every subspeciality or expertise to be available to participate on a Commission medical panel." With respect to Gamez's allegation that Dr. Biggs had a conflict of interest, the Board explained that "a potential for bias is insufficient grounds for disqualification" from serving on a medical panel, and because Gamez had not shown "actual bias," he could not prevail on his objection. The Board transferred the matter back to the ALJ to complete adjudication of Gamez's claims.

¶17 The medical panel, consisting of Dr. Biggs and Dr. Henrie, ultimately found that Gamez's work-related accident had only temporarily aggravated a preexisting low-back condition. And the panel concluded that any increase in Gamez's low-back symptoms "was no longer significantly related to the [work] injury by June 2017." The panel later clarified,

> [w]hen we stated that Mr. Gamez's low back pain was no longer significantly related to the crash injury by June 2017, we intended that to indicate when he returned to baseline. After additional discussion, we feel it is medically reasonable to say Mr. Gamez's low back pain would be no longer significantly related to his work injury and therefore back to baseline by June 30, 2017.

¶18 The ALJ accepted the amended panel report over Gamez's renewed objection. And she denied Gamez's claim for permanent partial disability compensation.

¶19 Gamez then filed a motion for review with the Board, challenging the medical panel's conclusions and Dr. Biggs's participation on the panel. He requested that the matter be remanded for consideration by a new medical panel.

¶20 The Board rejected Gamez's argument and upheld the ALJ's decision. But one commissioner issued a concurrence arguing for reconsideration of the Board's practice of rejecting conflict-of-interest objections to medical panel appointments unless the party offers "evidence of actual bias." The commissioner noted that this actual bias standard was based on the Board's reading of *Johnston v. Labor Comm'n*, 2013 UT App 179, 307 P.3d 615.

¶21 Following the Board's denial of his motion for review, Gamez petitioned for review in the court of appeals. He reasserted his challenges to Dr. Biggs's impartiality and qualification to serve on the panel, and contested the finding that the accident did not cause permanent injury to his low back. The court of appeals certified the matter to us pursuant to Utah Code section 78A-4-103(3) and Utah Rule of Appellate Procedure 43, highlighting the important and unsettled question of law presented, specifically: "In workers' compensation cases, what constitutes a conflict of interest sufficient to disqualify a physician from serving on a medical panel?" In addition to this question, the other issues raised by Gamez in the court of appeals are before us.[8]

¶22 We exercise jurisdiction pursuant to Utah Code subsection 78A-3-102(3)(b).

## STANDARD OF REVIEW

¶23 The standard of review applied to an appeal from an administrative decision "depends on the type of agency action alleged to be erroneous and whether that action incorporates a specific standard of review under section 63G-4-403(4) of [the Utah Administrative Procedures Act (UAPA)]." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 23, 308 P.3d 461. "[A] challenge to an administrative agency's finding of fact is reviewed for substantial evidence." *Provo City v. Utah Labor Comm'n*, 2015 UT 32, ¶ 8, 345 P.3d 1242 (citation omitted). "[W]e review the law applied to [those] facts for correctness." *Id.* ¶ 17 (citation omitted). And "we review the lower tribunal's ultimate conclusion of whether a given set of facts comes within the reach of a given rule of law as a mixed question of law and fact." *Id.* (citation omitted) (internal quotation marks omitted).

---

[8] A motion to strike filed by WCF is before us as well. We issued a replacement briefing order, under which both parties filed replacement briefs. WCF then moved to strike three exhibits appended to Gamez's replacement brief "on the grounds that such exhibits, presented for the first time in the replacement brief, are not part of the record on appeal." We deferred ruling on the motion. Our resolution of this case does not involve the information provided in the exhibits, and we have not considered them. Accordingly, we deny the motion as moot.

## ANALYSIS

¶24 We first address Gamez's argument that Dr. Biggs was unqualified to serve on the medical panel because he does not specialize in low-back injuries. We reject Gamez's interpretation of the Workers' Compensation Act to require all members of a medical panel to specialize in the condition or injury at issue. Rather, the statute mandates only that at least one panelist must specialize in the relevant condition. And because neither party disputes that Dr. Henrie meets this requirement, even accepting Gamez's contention that Dr. Biggs does not qualify as a specialist, that would not preclude him from panel membership here.

¶25 We then consider Gamez's argument that Dr. Biggs should have been disqualified because his affiliation with RMCOEH created a conflict of interest. We agree that the heightened "actual bias" standard does not comport with the Workers' Compensation Act. We disavow it, and hold that where a medical panelist's impartiality could reasonably be questioned, the statutory requirement for an impartial medical evaluation has not been met.

¶26 We therefore reverse the Board's dismissal of Gamez's conflict-of-interest objection. And we remand this matter to the Board to reconsider this objection in light of this clarified legal standard. Accordingly, we do not reach the merits of Gamez's claim that Dr. Biggs had a conflict of interest or his challenge to the Board's conclusion that his back had "returned to baseline."

## I. MEDICAL PANEL QUALIFICATIONS

¶27 We first address Gamez's contention that the Board erred when it upheld the appointment of Dr. Biggs as the medical panel chair because Dr. Biggs does not specialize in the treatment of the condition at issue in this case.

¶28 Subsection 601(1)(c) of the Workers' Compensation Act mandates that a medical panel appointed to resolve the controverted aspects of a workers' compensation claim "shall consist of one or more physicians specializing in the treatment of the disease or condition involved in the claim." UTAH CODE § 34A-2-601(1)(c). Gamez reads this subsection to mean that *all* panel members must specialize in the relevant condition. So under Gamez's interpretation of subsection 601(1)(c), a medical panel may consist of one or more members, and all of those members must specialize in the medical condition at issue.

¶29 The interpretation of a statute is a question of law that we review for correctness. *Waite v. Utah Labor Comm'n*, 2017 UT 86, ¶ 5, 416 P.3d 635. "When interpreting a statute, our primary objective is to ascertain the intent of the legislature." *McKitrick v. Gibson*, 2021 UT 48, ¶ 19, 496 P.3d 147 (citation omitted). Because "[t]he best evidence of the legislature's intent is the plain language of the statute itself, we look first to the plain language of the statute." *Bagley v. Bagley*, 2016 UT 48, ¶ 10, 387 P.3d 1000 (alteration in original) (citation omitted) (internal quotation marks omitted). In doing so, we read "each term according to its ordinary and accepted meaning." *State v. Barrett*, 2005 UT 88, ¶ 29, 127 P.3d 682 (citation omitted) (internal quotation marks omitted).

¶30 The best support for Gamez's argument is the word "consist" in the statutory text. "Consist" means "to be composed or made up," usually followed by "of." *Consist*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/consist (last visited Feb. 24, 2022). So there is some textual support for reading the statute to mean that a medical panel must be made up of one or more physicians who all specialize in the condition at issue.

¶31 But this is not the best reading of the statute because it requires us to accept that a panel may consist of only one member. And as we will explain, we agree with WCF that a panel generally cannot, by definition, consist of just one person. So the phrase "one or more" necessarily relates to the number of *specialists* required on a medical panel, and not the total number of *panelists*. *See* UTAH CODE § 34A-2-601(1)(c).

¶32 "Panel" generally refers to at least two or more people, and this meaning is consistent throughout various dictionaries.[9]

_____

[9] Dictionaries, which serve as "an historical record . . . of the meanings which words in fact have borne," provide a useful starting point for the assessment of ordinary meaning. *State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719 (citation omitted) (internal quotation marks omitted). And while "the dictionary alone is often inadequate to the task of interpretation because different definitions may support different interpretations," *GeoMetWatch Corp. v. Utah State Univ. Rsch. Found.*, 2018 UT 50, ¶ 21, 428 P.3d 1064 (citation omitted) (internal quotation marks omitted), the term "panel" presents no such ambiguity.

For example, Merriam Webster's Dictionary defines panel as "a *group* of persons selected for some service (such as investigation or arbitration)." *Panel*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/panel (last visited Feb. 24, 2022) (emphasis added). The Oxford English Dictionary defines panel as "a small *group* of people brought together to discuss, investigate, or decide upon a particular matter." *Panel*, OXFORD ENGLISH DICTIONARY, www.oed.com/view/Entry/136796 (last visited Feb. 24, 2022) (emphasis added). And the Collins English Dictionary defines panel as "a small *group* of people who are chosen to do something, for example, to discuss something in public or to make a decision." *Panel*, COLLINS, https://www.collinsdictionary.com/us /dictionary/english/panel (last visited Feb. 24, 2022) (emphasis added). Further, while Black's Law Dictionary defines "panel" solely in reference to potential jurors or selected arbiters, it too refers exclusively to a "group" or "set" of persons or judges. *Panel*, BLACK'S LAW DICTIONARY (11th ed. 2019).

¶33 This commonly accepted meaning is reflected in the ALJ's statement that "Adjudication Division policy requires that medical panels have <u>at least two</u> members on them." And while Gamez argues that the legislature intended "only specialists" to serve on a medical panel, "we have repeatedly declined invitations to interpret statutes contrary to their plain language even when a party offers an interpretation that might better advance the [legislative] purpose." *Zilleruelo v. Commodity Transporters, Inc.*, 2022 UT 1, ¶ 40, 506 P.3d 509.

¶34 "When we can ascertain the intent of the legislature from the statutory terms alone, no other interpretive tools are needed." *Bagley*, 2016 UT 48, ¶ 10 (citation omitted) (internal quotation marks omitted). Here, the plain meaning of panel as a group of two or more is clear. By extension, the phrase "*one* or more" necessarily speaks to the number of specialists required to participate on a panel, and not the number of panel members in total. *See* UTAH CODE § 34A-2-601(1)(c) ("A medical panel . . . shall consist of one or more physicians specializing in the treatment of the disease or condition involved in the claim.").

¶35 Accordingly, the plain meaning of the statute is that at least one of the physicians who serves on a medical panel must specialize in the condition or injury involved in the claim. But it does not require this of all panel members. And because the statute is unambiguous, we "have no need to resort to other

methods of construction," *O'Keefe v. Utah State Ret. Bd.*, 956 P.2d 279, 281 (Utah 1998), and our analysis is at an end.

¶36 Therefore, even if Dr. Biggs does not qualify as a specialist in low-back injuries, the panel would meet the requirements of subsection 601(1)(c) because neither party disputes that Dr. Henrie so qualifies. Therefore, we conclude that the Board properly determined the medical panel in this case was suitably composed.[10]

## II. CONFLICT OF INTEREST

¶37 Gamez next asserts that Dr. Biggs's affiliation with RMCOEH presents a "clear conflict of interest" that should disqualify him from serving on the medical panel in this case because WCF provides funding to RMCOEH.

¶38 Section 601 of the Workers' Compensation Act, which governs the use of medical panels, does not explicitly require that the members of a medical panel be impartial. However, both parties agree that panel members must be impartial. And the Board's review of Gamez's claim using an "actual bias" standard indicates that it too presumes that panelists must not harbor bias.

---

[10] This analysis has the effect of overturning holdings in a number of court of appeals opinions that run counter to this statutory analysis. *See, e.g.*, *Johnston v. Labor Comm'n*, 2013 UT App 179, ¶¶ 21–22, 307 P.3d 615 (concluding that "it is readily apparent from a cursory review of the statute and relevant case law that single-member medical panels are acceptable" and that section 34A-2-601 "plainly allows administrative law judges to appoint single-member medical panels"); *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 22, 428 P.3d 26 (suggesting that section 601(1)(c) requires that all panelists—regardless of how many members make up a panel—be specialists: "[T]he statute's plain language requires that the panel consist of *physicians* who specialize in the 'treatment of the disease or condition' at issue in the case" (emphasis added) (citing UTAH CODE § 34A-2-601(1)(c)); *Fastenal v. Labor Comm'n*, 2020 UT App 53, ¶ 32, 463 P.3d 90 (citing *Foye* for the proposition that "the statute does not require the members of the panel to be experts in force; it requires them 'to specializ[e] in the treatment of the disease or condition involved in the claim'" (alteration in original) (citing UTAH CODE § 34A-2-601(1)(c)).

¶39 While there is no direct language in section 601 establishing such a requirement, it can be inferred from the use of "impartial" in subsection 601(1)(d), which grants the adjudication division the authority to "employ a medical director or one or more medical consultants" as "an alternative method of obtaining an *impartial medical evaluation* of the medical aspects of a controverted case" if certain conditions are met. UTAH CODE § 34A-2-601(1)(d) (emphasis added).

¶40 "[W]herever possible, we give effect to every word of a statute, avoiding [a]ny interpretation which renders parts or words in a statute inoperative or superfluous." *Downs v. Thompson*, 2019 UT 63, ¶ 17, 452 P.3d 1101 (second alteration in original) (citation omitted) (internal quotation marks omitted). And we infer from the description of the options in subsection 601(1)(d) as "*alternative* method[s] of obtaining an *impartial* medical evaluation" that the primary method to which they are alternatives—namely, a medical panel as established in subsection 601(1)(a)—must also be impartial. (Emphases added.) And if a medical panel is to provide an impartial medical evaluation, it follows that the physicians on the panel must be impartial.

¶41 What constitutes impartiality, however, is not defined in section 601 or the Workers' Compensation Act more broadly. But in *Johnston v. Labor Comm'n*, the court of appeals held that an allegation of apparent bias on the part of a medical panelist because he had an "office-sharing agreement with numerous insurance medical examiners" was "speculative and not supported by the record." 2013 UT App 179, ¶¶ 7, 19, 307 P.3d 615 (internal quotation marks omitted). And it declined to overturn the Labor Commission's resolution of the claim of bias without an objection hearing on that basis. *Id*. ¶ 20.

¶42 Although the *Johnston* court did not use the term "actual bias" in reaching its holding, subsequent Labor Commission cases have routinely cited *Johnston* when rejecting claims of bias or conflict of interest against physicians serving on medical panels. And the decisions have done so—as the Board does here—by finding a potential for bias "insufficient grounds for disqualification," and holding that parties must offer evidence of "actual bias" to successfully challenge a medical panel appointment.

¶43 Gamez asks us to "significantly limit or overrule" *Johnston* and its progeny, and instead apply our Code of Judicial Conduct to identify the types of conflicts of interest that would be

sufficient to disqualify a physician from serving on a medical panel. He argues that because we have observed that medical panels "are considered 'adjuncts' to the ALJ at the commission level," *In re Discipline of LaJeunesse*, 2018 UT 6, ¶¶ 5, 8, 416 P.3d 1122, we should treat physicians serving on them as akin to "court official[s]" or other "quasi-judicial officer[s]," and assess their impartiality using the same standard we apply to judicial conflicts of interest. And he emphasizes that in practice, medical panel reports are almost always "adopted wholesale by the Labor Commission," thereby compounding the problems inherent in relying on a standard with a "near impossibl[e]" burden of proof.

¶44 WCF disagrees. It argues that application of our judicial code to medical panels would be inappropriate because "medical panels are not intended to serve in any judicial capacity whatsoever," but rather in an "advisory role, similar to an expert witness." Further, WCF points out that even ALJs are not governed by the Code of Judicial Conduct and, unlike judges, medical panels do not hold final decision-making responsibilities. While WCF concedes that our code of conduct "may have some analogous application," it argues that the Board correctly denied Gamez's motion for interlocutory review because, in line with *Johnston*, there was "no evidence of actual bias or conflict of interest on the part of the medical panel members in general and Dr. Biggs in particular."

¶45 But while the parties focus on *Johnston* and the judicial code, the impartiality requirement stems from subsection 601(1)(d) of the statute. *See supra* ¶¶ 38–39. So the real question before us is the meaning of "impartial" within the context of the statute.

¶46 "We have repeatedly affirmed our commitment to interpreting statutes according to the 'plain' meaning of their text." *Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 9, 248 P.3d 465 (citation omitted); *see, e.g.*, *supra* ¶¶ 29–34. "Thus, when the words of a statute consist of 'common, daily, nontechnical speech,' they are construed in accordance with the ordinary meaning such words would have to a reasonable person familiar with the usage and context of the language in question." *Olsen*, 2011 UT 10, ¶ 9 (citation omitted).

¶47 And here, imputing an actual bias standard to the statutory text overlooks a key component of the plain meaning of "impartial." As mentioned above, *supra* ¶ 32 n.9, dictionaries provide a useful starting point for the assessment of ordinary

meaning. *State v. Bagnes*, 2014 UT 4, ¶ 14, 322 P.3d 719. Black's Law Dictionary defines "impartial" as "[n]ot favoring one side more than another; unbiased and *disinterested*; unswayed by personal interest." *Impartial*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added). To be "disinterested," in turn, means to be "[w]ithout interest or concern," and "[n]ot influenced by interest." *Disinterested*, OXFORD ENGLISH DICTIONARY, www.oed.com/view/Entry/54618 (last visited Feb. 24, 2022).

¶48 Thus, to assess whether an individual is "impartial," one must also assess whether they are "disinterested"—in other words, whether they are free from a conflict of interest. And a "conflict of interest" includes both "[a] real *or seeming* incompatibility between one's private interests and one's public or fiduciary duties." *Conflict of interest*, BLACK'S LAW DICTIONARY (11th ed. 2019) (emphasis added).

¶49 The actual bias standard applied below obscures this element of disinterestedness. Indeed, even the meaning of "bias" is not limited to "actual bias." Black's Law Dictionary defines bias as "[a] mental inclination or tendency; prejudice; predilection." *Bias*, BLACK'S LAW DICTIONARY (11th ed. 2019). "Actual bias" is merely one of multiple sub-types of "bias"—a list that includes "implied bias," or "prejudice that is inferred from the experiences or relationships of a judge, juror, witness, or other person." *Implied bias*, BLACK'S LAW DICTIONARY (11th ed. 2019). So the term incorporates both actual bias (prejudice) and bias that can be inferred because of a person's relationships.[11]

¶50 Thus, in keeping with the statute, all physicians appointed to medical panels must be "impartial" in order to provide an "impartial medical evaluation." And recognizing the scope of the term "impartial," we hold that where a medical panelist's impartiality could reasonably be questioned, the statutory requirement for an impartial medical evaluation has not been met.

---

[11] Merriam-Webster's Dictionary similarly defines bias in a manner that incorporates both actual prejudice and an inclination towards such prejudice. *See Bias*, MERRIAM-WEBSTER, https://www.merriam-webster.com/dictionary/bias (last visited Nov. 1, 2021) (defining "bias" as both "an inclination of temperament or outlook" and "an instance of such prejudice").

¶51 We agree with WCF that medical panels are not subject to our Code of Judicial Conduct. And we reject Gamez's request that we apply the Code to medical panelists. However, we reference the Code here to provide illustrative examples of the circumstances that have been deemed to create a conflict of interest for judges. Under rule 2.11 of the Code of Judicial Conduct, "[a] judge shall disqualify himself or herself in any proceeding in which the judge's impartiality might reasonably be questioned." The rule then provides a non-exhaustive list of circumstances under which judges must disqualify themselves because their impartiality might, in fact, be reasonably questioned, including where: the judge's spouse or immediate family is involved in the proceeding as a lawyer or a party, *id.* 2.11(A)(2)(a)–(b); a "judge knows that he or she, individually or as a fiduciary . . . has an economic interest in the subject matter in controversy or in a party to the proceeding," *id.* 2.11(A)(3); a "judge knows or learns . . . that a party, a party's lawyer, or the law firm of a party's lawyer has within the previous three years made aggregate contributions to the judge's retention in an amount . . . greater than $50," *id.* 2.11(A)(4); or a judge "has made . . . public statement[s] . . . that . . . appear[] to commit the judge to . . . rule in a particular way in the proceeding . . . ." *id.* 2.11(A)(5).

¶52 We provide these examples for illustrative purposes only. And we reiterate that we are not imposing the Code of Judicial Conduct upon medical panelists. We hold only that a physician should be disqualified from a medical panel where his or her impartiality could reasonably be questioned. The examples we provide above may be useful in conducting that analysis, but we do not presume that they will apply across the board in the different setting of medical evaluations under the Workers' Compensation Act. And while we provide this general standard for assessing impartiality, we note that the Labor Commission could choose to make more specific rules in line with or above this floor that are tailored to the medical evaluation context. *See* UTAH CODE § 34A-1-104(1) ("[T]he commission may . . . adopt rules when authorized by this title, or Title 34, Labor in General, in accordance with the procedures of Title 63G, Chapter 3, Utah Administrative Rulemaking Act.").

¶53 Because we have clarified the standard for evaluating an objection to a medical panelist based on an alleged conflict of interest, we vacate the Board's dismissal of Gamez's motion for interlocutory review on this issue. And we remand to the Board to

consider Gamez's objection under this clarified standard. Accordingly, we do not reach Gamez's arguments that Dr. Biggs's affiliation with RMCOEH created a conflict of interest in this case or that the Board wrongly accepted the medical panel's conclusion that his low-back condition had "returned to baseline."

## CONCLUSION

¶54  We uphold the Board's conclusion that under Utah Code subsection 34A-2-601(1)(c), only one medical panel member need specialize in the condition at issue. But we disavow the actual bias standard that has governed allegations of panelist partiality in Labor Commission cases following *Johnston v. Labor Comm'n*, 2013 UT App 179,  307 P.3d 615.  Accordingly, we vacate the Board's dismissal of Gamez's interlocutory objection to the medical panel based on Dr. Biggs's alleged conflict of interest. And we remand to the Board to consider this objection in accordance with the legal standard established in this opinion.

———————