**2023 UT App 30**

## THE UTAH COURT OF APPEALS

FRAN HORNING,
Petitioner,

*v.*

LABOR COMMISSION, AEROSCAPE,
AND AMERICAN LIBERTY INSURANCE,
Respondents.

Opinion
No. 20210562-CA
Filed April 6, 2023

Original Proceeding in this Court

Gary E. Atkin and K. Dawn Atkin, Attorneys
for Petitioner

Chad P. Curtis and Victor M. Perri, Attorneys for
Respondents Aeroscape and American
Liberty Insurance

JUDGE DAVID N. MORTENSEN authored this Opinion, in which
JUDGE RYAN D. TENNEY and JUSTICE JILL M. POHLMAN concurred.[1]

MORTENSEN, Judge:

¶1      Fran Horning lost consciousness at work when a weed trimmer engine fell off a shelf and struck him in the head. He complained of continuing psychological issues long after the accident. He received workers' compensation benefits for some time, but when his employer cut off the benefits, Horning sought a hearing. The administrative law judge (ALJ), relying on a

---

1. Justice Jill M. Pohlman began her work on this case as a member of the Utah Court of Appeals. She became a member of the Utah Supreme Court thereafter and completed her work on the case sitting by special assignment as authorized by law. *See generally* Utah R. Jud. Admin. 3-108(4).

medical panel's report, denied ongoing benefits. Horning challenged the qualifications of the medical panel members, but the ALJ overruled the objection. Horning then sought review before the Utah Labor Commission (Commission), which also denied ongoing benefits. Horning now seeks judicial review of the Commission's order, and we decline to disturb it.

BACKGROUND

¶2 In early August 2015, while working for Aeroscape, Horning was injured when a weed trimmer engine weighing roughly four pounds fell about three feet from a shelf and struck him on the head. He briefly lost consciousness and was taken by ambulance to the hospital, where he stayed overnight. While in the hospital, "he was diagnosed with a closed-head injury with symptomatic concussion."

¶3 Horning returned to work part-time a month or so later, but he found it difficult to concentrate, and workplace noise would trigger headaches and mental fatigue. He also would stumble around at times while working. Horning was released from work on October 16, 2015. He received temporary total disability compensation from October 17, 2015, to June 19, 2016.

¶4 In January 2016, Horning began treatment for post-concussion syndrome and "underwent various treatments to treat his symptoms, including sleep problems, headaches, and depression." In March 2016, Horning was diagnosed "with major depression and anxiety," and his doctor recommended that Horning attend "psychotherapy sessions," which Horning attended for about seven months. Around this time, Horning was also diagnosed with post-traumatic stress disorder (PTSD).

¶5 Aeroscape's medical consultant (Dr. Mattingly) evaluated Horning in June 2016 and opined that Horning had "sustained a concussion and cervical-spine strain as a result of the work

accident" but noted that the "mechanism of injury [was] not consistent with causing PTSD, anxiety or depression." Another Aeroscape medical consultant (Dr. Houston) concluded that "Horning did not develop a persistent neurocognitive disorder or PTSD" and that he had "non-industrial depression and anxiety." Based on the opinions of these two doctors, Aeroscape ceased providing Horning with workers' compensation benefits.

¶6    Horning filed an application for a formal hearing before an ALJ. At the hearing, the parties agreed that park surveillance video taken of Horning after the accident would not be introduced as evidence. The parties also stipulated that two pages of the medical record that contained a description of what was seen in the surveillance video would be stricken from the record. These two pages had formed an addendum to Dr. Houston's report. But Horning did not object to at least one other reference to the surveillance video being included in the record, because it was "far more general" and shorter than the other references. In addition to mentioning the dates and duration of the video recordings, this included reference stated,

> [Dr. Houston's] opinion is [that Horning's] video presentation does not appear to be consistent with his medical complaints including physical, balance, and mental as described in the medical record for the same corresponding time period March 2016 through July 2016. He seems to move and ambulate with coordinated agility at an up-tempo pace whenever required. There is no visible evidence of pain behavior, balance problems, fatigue, depressed affect, anxious behavior, or cognitive confusion. He visibly engages with others in a pleasant way and most notably seems to be able to sustain concentration, persistence and pace for prolonged periods when filming his children's baseball and soccer games.

¶7 The ALJ ordered that the case be referred to a medical panel because it was "clear that there [were] conflicting medical opinions regarding the medical causation of [Horning's] ongoing medical and mental health issues."

¶8 The ALJ appointed Dr. Shawn Smith and Dr. Sean Biggs to the medical panel. The panel "reviewed all of the medical records" it had received. Apparently, the two pages describing the excluded video surveillance were included in the materials submitted to the panel, as evidenced by three statements included in the report. First,

> Dr. Mattingly reviewed video surveillance and noted that [Horning] was at a park and soccer game for two hours, standing mostly, walking, [and] taking pictures, without any signs of being off balance. He was seen leaning over, squatting down, bending over and assuming other positions without difficulty. Other video episodes were reviewed without any signs of problems with balance, standing or talking for long periods of time.

Second,

> Dr. Houston reviewed surveillance video and noted that there was no visible evidence of pain behavior, balance problems, fatigue, depressed affect, anxious behavior or cognitive confusion. [Horning] seemed able to sustain concentration, persistence and pace for prolonged periods when filming his children's baseball and soccer games.[2]

---

2. The language of the second statement parrots that of the description of the video surveillance that Horning did not object to being included in the record, so the second reference could

(continued…)

Third,

> Dr. Houston wrote an addendum in response to questions related to surveillance video and [Horning's] deposition. Dr. Houston noted that [Horning] was able to get out of the passenger side of a car without difficulty. [Horning] had no difficulty fishing, flexing at the waist and standing erect, bending over a pier railing, or kicking out the right leg in a quick side-sweeping motion without losing his balance.

¶9 After a comprehensive review of the medical record, which consisted of well over 800 pages, the panel came to the following conclusions: Horning sustained a "[c]oncussion with resulting headache and dizziness and mood instability" and "[n]eck strain" from the accident; it was "medically more likely than not that no other conditions arose secondarily as a result of the conditions listed"; the "concussion with resulting headache and dizziness and the neck strain most likely became medically stable six months after the industrial accident, on February 7, 2016"; and there was "no objective evidence that [Horning] had a preexisting condition that increased the risk of injury nor that contributed to the industrial injury." Notably, the panel addressed Horning's complaints of psychological issues in these terms:

> Given the mechanism of injury and the minor classification of his [traumatic brain injury (TBI)], it is unlikely that the work injury caused any mood or emotional symptoms beyond the period of medical stability. Any current mood abnormalities, such as

have just as easily come from that portion of the record as from the stricken portion. *See supra* ¶ 6. In contrast, the first and third statements contain descriptions that are not included in the admitted evidence and an explicit reference to the addendum.

depression or anxiety, would not be considered to be a result of the TBI. There is no objective evidence to support a diagnosis of post-traumatic-stress-disorder (PTSD) . . . .

It is medically more likely than not that [Horning's] emotional and mood symptoms that persisted after the period of medical stability did not arise secondarily to the TBI.

¶10 Horning objected to the medical panel's report on the following grounds: the inclusion of descriptions outlining the video surveillance tainted the medical panel, the medical panel made factual findings contrary to those made at the hearing by the ALJ, the medical panel did not include a basis for its conclusion that Horning had reached maximum medical improvement, the panel failed to address the aggravation of Horning's preexisting conditions, and the medical panel did not properly address Horning's ongoing mood instability. Based on these issues—in particular, the panel's consideration of the excluded evidence—Horning requested a new medical panel be appointed and the matter "be reexamined from scratch."

¶11 The ALJ declined to appoint a new medical panel but elected to send the matter back to the same panel for clarification as to specific questions and with the explicit instruction to "exclude from . . . consideration" Dr. Mattingly's and Dr. Houston's "assertions of what they saw on the video tape, and simply use the remaining medical exhibit, [the ALJ's] fact findings, and the results of [the medical panel's] evaluation" of Horning. The medical panel responded to the ALJ's questions, and Horning filed another objection to the report, but the ALJ rejected Horning's objection and admitted the medical panel's responses into evidence.

¶12 In May 2019, the ALJ issued its findings of fact, conclusions of law, and order denying ongoing benefits. Horning filed a

motion for review, raising three issues: (1) that the panel improperly considered stricken evidence; (2) that the composition of the panel did not meet statutory requirements "in that there was no specialist in the treatment of TBI/concussion, headaches, hearing damage, PTSD, anxiety or spinal injury"; and (3) that the report contained numerous faults, including using unnamed and rejected studies, excluding Horning's psychological injuries as not objectively provable, and requiring Horning to prove that no pre-existing conditions existed.[3]

¶13    The Commission rejected Horning's arguments about the stricken evidence and the alleged substantive faults in the report, but it remanded the matter to the ALJ to address the panel members' "expertise in treating the specific conditions to which . . . Horning attributes his disability." The two panelists provided their qualifications in two responses. The following was submitted for Dr. Biggs:

> Dr. Biggs is board certified in Family Medicine and currently works as a full-time occupational medicine clinician, specializing in work-related illness and injuries. Dr. Biggs has a Master's degree in Occupational Health and has extensive experience diagnosing and treating concussion, post-concussion syndrome and cervical injuries. Dr. Biggs performs hearing exams and diagnoses and manages work-related noise injuries and symptoms, including tinnitus. He has many years of experience diagnosing and treating anxiety and depression as a family physician. Dr. Biggs diagnoses acute stress response conditions related to work trauma as well as post-traumatic stress

---

3. Aeroscape also filed a motion for review on the issue of offset for overpayments, which the ALJ addressed on remand.

disorders, coordinating treatment with trained psychologists.

Dr. Smith's qualifications were described as follows:

> Dr. Smith is board certified in Neurology and in Neurocritical Care and works as a full time neurointensivist. Dr. Smith has experience in diagnosis and treatment of traumatic brain injury, post-concussion syndrome, headache, and other sequela of traumatic brain injury.

And a supplemental submission added to Dr. Smith's qualifications:

> Dr. Smith is board certified in Adult Neurology through the American Board of Psychiatry and Neurology and is fellowship trained and board certified in Neurocritical Care through the United Council for Neurological Subspecialties. Dr. Smith has many years of experience in outpatient and hospital-based neurology.

¶14 Horning filed continuing objections to the substance of the panel's report and the panel members' qualifications. Incorporating its previous findings of fact, conclusions of law, and order, the ALJ issued an amended order that addressed the panel members' expertise. The ALJ found that "the medical panel members have expertise and years of experience in treating persons with traumatic brain injuries and post-concussion problems including headaches, as well as evaluating hearing problems such as tinnitus, and anxiety and depression." The ALJ thus determined that the panel members were "qualified to evaluate" Horning's conditions.

¶15 Horning again filed a motion for review, reiterating his assertions that the panel improperly reviewed excluded evidence,

used unnamed or rejected studies as a basis for its conclusions, required objective evidence to establish coverable psychological injuries, improperly required Horning to prove the lack of pre-existing conditions, did not understand that medical causation can arise secondarily from a work accident, and determined that Horning had returned to baseline without addressing pre-injury status.

¶16    In July 2021, the Commission issued an order affirming the ALJ's decision. The Commission relied on the medical panel's report in concluding that "no . . . causal connection existed" between Horning's "current neurological symptoms as well as his depression and anxiety symptoms" and his work injury. Horning now seeks judicial review of the decision.

ISSUES AND STANDARDS OF REVIEW

¶17    Horning contends that the medical panel was not qualified to address his medical and mental health issues. "A challenge to an administrative agency's finding of fact is reviewed for substantial evidence. We review the law applied to those facts for correctness." *Gamez v. Utah Labor Comm'n*, 2022 UT 20, ¶ 23, 511 P.3d 1145 (cleaned up).[4]

---

4. For some time, various judges on this court have been using the parenthetical "(cleaned up)" to enhance the readability of our opinions. *See State v. Cady*, 2018 UT App 8, ¶ 9 n.2, 414 P.3d 974, *cert. denied*, 421 P.3d 439 (Utah 2018). Our opinions also employ the parenthetical "(quotation simplified)," which is identical in meaning to "(cleaned up)." *See In re K.W.*, 2018 UT App 44, ¶ 15 n.3, 420 P.3d 82. Both parentheticals indicate the omission of internal quotation marks, brackets, ellipses, emphases, internal citations, and footnote signals in published sources, as well as the traditional parenthetical notation referencing a prior case or cases

(continued…)

¶18    Horning next argues that the Commission exceeded its discretion in considering the medical panel's report—which he alleges was tainted by exposure to descriptions of the surveillance video—over his objection. "We review the [Commission's] refusal to exclude a medical panel report on the basis of an objection under an abuse of discretion standard, providing relief only if a reasonable basis for that decision is not apparent from the record." *Foye v. Labor Comm'n*, 2018 UT App 124, ¶ 16, 428 P.3d 26 (cleaned up), *abrogated on other grounds by Gamez v. Utah Labor Comm'n*, 2022 UT 20.

¶19    Horning lastly complains that the Commission's factual findings on the issue of medical causation were not supported by substantial evidence. "Whether the Commission properly found that medical causation exists is a question of fact we review for

---

being quoted. Ellipses indicate all other omissions. We also use these parentheticals to make unbracketed changes to capitalization. Apart from capitalization, alterations to words in the source are indicated by brackets.

These parentheticals are powerful editing tools because they make legal writing less tedious, more streamlined, and more concise. But their appeal begets a temptation to misuse them. And we acknowledge that we have, at times, ventured too far by using them with (1) quotations from unpublished sources not readily available to the public (namely, briefs, lower court documents, and transcripts) and (2) quotations of parenthetical language from cases citing other cases. To be more transparent and precise, we intend to limit our employment of these parentheticals to the circumstances identified in the above paragraph, and we expect practitioners who choose to employ these devices to abide by these same strictures. So that consistency of use might be achieved, the publishers of *The Bluebook* may wish to adopt rules similar to those proffered by Jack Metzler. *See* Jack Metzler, *Cleaning Up Quotations*, 18 J. App. Prac. & Process 143, 154–55 (2017).

substantial evidence. In reviewing for substantial evidence, we defer to the agency if there is a quantum and quality of relevant evidence that is adequate to convince a reasonable mind to support a conclusion." *YESCO v. Labor Comm'n*, 2021 UT App 96, ¶ 13, 497 P.3d 839 (cleaned up).

## ANALYSIS

### I. Qualifications of the Medical Panel

¶20    Citing *Wright v. Labor Commission*, 2021 UT App 43, 489 P.3d 211, *cert. granted*, 496 P.3d 711 (Utah 2021), Horning argues that the two panel members were not qualified because the Commission made no finding that the members had "extensive experience in treating the conditions at issue." *See id.* ¶ 22 (cleaned up). He further asserts that their lack of qualification is demonstrated by the panel's "inability to determine the causation of [the] psychological and hearing injuries" he sustained after the accident.

¶21    The law on a medical panel's qualifications is clear: "A medical panel . . . shall consist of one or more physicians specializing in the treatment of the disease or condition involved in the claim." Utah Code § 34A-2-601(1)(c). "[T]he plain meaning of the statute is that at least one of the physicians who serves on a medical panel must specialize in the condition or injury involved in the claim. But it does not require this of all panel members." *Gamez v. Utah Labor Comm'n*, 2022 UT 20, ¶ 35, 511 P.3d 1145.

¶22    The ALJ, based on the submissions of the panel members regarding their credentials, *see supra* ¶ 13, stated, "Clearly the medical panel members have expertise and years of experience in treating persons with traumatic brain injuries and post-concussion problems including headaches, as well as evaluating hearing problems such as tinnitus, and anxiety and depression.

The [ALJ] concludes the panel members are qualified to evaluate [Horning's] conditions."

¶23 Horning challenges the panel's qualifications by arguing that "in light of their inability to determine the causation of [his] psychological injuries, it is hard to place either panel member in the category of being *specialized* in the diagnosis and treatment of such injuries." But Horning does not cite any authority, nor are we aware of any, that supports his circular reasoning that because the panel members were unable to determine the causation of Horning's psychological injuries, the panel members could not be placed in the category of those who specialize in psychological injuries.

¶24 Contrary to Horning's assertion, the record clearly indicates that both panel members "specializ[ed] in the treatment of the disease or condition involved in the claim." *See* Utah Code § 34A-2-601(1)(c). Dr. Biggs explicitly stated that he (1) "has extensive experience diagnosing and treating concussion, post-concussion syndrome and cervical injuries," (2) "has many years of experience diagnosing and treating anxiety and depression as a family physician," and (3) "diagnoses acute stress response conditions related to work trauma as well as post-traumatic stress disorders." And Dr. Smith is a board-certified neurologist who (1) works as a neurointensivist, (2) "has experience in diagnosis and treatment of traumatic brain injury, post-concussion syndrome, headache, and other sequela of traumatic brain injury," and (3) "has many years of experience in outpatient and hospital-based neurology." These are the very type of panel members "specializing in the treatment of the disease or condition involved in the claim" called for in the statute. *See id.*

¶25 Consequently, we reject Horning's claim that the panel was not qualified.

## II. Admission of Excluded Evidence

¶26 Horning argues that the Commission erred in considering the medical panel's report because, he contends, the panel was tainted by having seen two stricken pages in the record that discussed the excluded evidence. Horning states,

> This [excluded evidence] appears to have been taken into consideration by the panel as reflected by their statements such as, "Underlying motives in the form of primary or secondary gain could be influencing recovery," and "There is a reported propensity for a sizable portion of those with mild TBI to exaggerate the duration and severity of the symptoms, especially with secondary gain considerations," among other such statements regarding the credibility of [Horning's] reported injuries.

(Footnote omitted.)

¶27 With our standard of review in mind, we conclude that Horning has not shown that it was an abuse of discretion for the Commission to consider the medical panel's report. After all, the ALJ had, in response to Horning's objection, instructed the medical panel to "exclude from . . . consideration" any assertions of what was seen on the surveillance video and rely instead on "the remaining medical exhibit, [the ALJ's] fact findings, and the results of [the medical panel's] evaluation" of Horning when she returned the matter to it. That the panel came to conclusions about Horning's motives for asserting the severity and duration of his psychological injuries with which Horning disagrees does not show that the panel relied on excluded evidence to reach those conclusions. Given that there is no reason to conclude that the panel disregarded the ALJ's instructions—apart from Horning's unsupported allegation that the panel was tainted—we discern no abuse of discretion by the Commission in considering the report.

¶28 Thus, we reject Horning's claim that the Commission abused its discretion in considering the medical panel's report in its deliberations.

### III. The Commission's Factual Findings

¶29 Horning argues that the Commission failed to recognize that the medical panel's report was "based upon nebulous, distorted and incorrect foundations." Horning asserts that because the Commission relied on the allegedly erroneous medical panel report, there was not a sufficient "quantum of substantial, competent evidence to sustain the Commission's order" with regard to its "determination of medical causation."[5]

---

5. Specifically, Horning identifies seven alleged deficiencies in the medical panel's report: (1) the panel's determination that objective evidence was necessary to conclude that Horning's mental symptoms were due to the accident; (2) the panel's statement that it was not possible to determine that the accident caused Horning's psychological symptoms, contradicting its conclusion that the accident did not cause those symptoms; (3) the panel's assertion that it was not possible to determine that the accident caused Horning's hearing loss, contradicting its conclusion that the accident did not cause his hearing loss; (4) the panel's conclusion that a pre-existing psychiatric disease contributed to Horning's mental symptoms; (5) the panel's failure "to understand and consider that, under Utah law, a 'contribution' by the industrial accident to the current symptoms is a sufficient basis for 'causation' of those symptoms"; (6) the panel's failure to provide a basis for its determination that Horning's neck pain and radiculopathy were non-industrial; and (7) the panel's failure to provide a basis for its determination of Horning's maximum medical improvement.

(continued…)

¶30 "Because it is the province of the Commission to view all the evidence submitted as a whole and then make an appropriate determination, appellate courts will not review the Commission's credibility assessments or reweigh evidence *unless* the petitioner is able to show that the Commission's findings and conclusions regarding causation are not supported by substantial evidence." *JBS USA v. Labor Comm'n*, 2020 UT App 86, ¶ 11, 467 P.3d 905 (cleaned up). "Substantial evidence is more than a mere scintilla of evidence though something less than the weight of the evidence, and the substantial evidence test is met when a reasonable mind might accept as adequate the evidence supporting the decision." *Hutchings v. Labor Comm'n*, 2016 UT App 160, ¶ 30, 378 P.3d 1273 (cleaned up), *cert. denied*, 390 P.3d 720 (Utah 2017).

¶31 Here, Horning has "highlighted only the evidence" that he believes undermines the Commission's findings and has not "marshaled the evidence supporting the Commission's factual findings." *See JBS USA*, 2020 UT App 86, ¶ 12. And "although failing to marshal the evidence is no longer considered a technical deficiency, an appellant failing to marshal all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous will almost certainly fail to carry their burden of persuasion on appeal."

---

With regard to the medical panel's causation determination, Horning is critical of the panel's use of certain "AMA guides," arguing that they have not been specifically adopted for use by the Commission. Horning appears to argue that the panel should use AMA guides only if those guides have been approved by the Commission. But nothing in the Commission's rule adopting guides for a specific issue (e.g., establishing impairment ratings, *see* Utah Admin. Code R612-300-9(B)) indicates a requirement that approval of AMA guides is necessary for their use in proceedings not involving that specific issue.

*Widdison v. Kirkham*, 2018 UT App 205, ¶ 9, 437 P.3d 555 (cleaned up).

¶32   In addition to the medical panel's opinion—which is the source of all of Horning's sufficiency of the evidence complaints—there is additional evidence to support the Commission's findings. Ultimately, it is not the findings of the medical panel that are under review but the Commission's findings, and those findings go beyond the conclusions of the medical panel to include consideration of the entire record, a fact that Horning ignores. Indeed, Horning does nothing to attack the Commission's findings apart from asserting that they were entirely based on the medical panel's report. But along with the medical panel's conclusions—which the Commission found "to be persuasive" because they were "supported by the record" and were "the product of impartial, collegial, and expert review of all of . . . Horning's relevant medical history"—the Commission relied on the entirety of the medical record and the opinions of the other doctors in concluding that the conditions at issue were not medically causally connected to the industrial accident.

¶33   Because the Commission's findings were based on not only the report of the medical panel—which itself constituted substantial evidence before the Commission—but also the corroborating reports of other doctors and the entirety of the medical record, we conclude that the Commission's findings were supported by substantial evidence and should not be disturbed.

CONCLUSION

¶34   Horning has not shown that the medical panel lacked the expertise to evaluate his conditions, that the Commission abused its discretion in relying on the medical panel's report, or that the Commission's factual findings were not supported by substantial evidence. Accordingly, we decline to disturb the Commission's decision.