**2025 UT App 170**

## THE UTAH COURT OF APPEALS

AMBER KLEIN,
Appellee,
*v.*
MELVIN JAMES KLEIN,
Appellant.

Opinion
No. 20240231-CA
Filed November 20, 2025

Sixth District Court, Manti Department
The Honorable Marvin D. Bagley
No. 194600147

Brody N. Miles, Attorney for Appellant

Douglas L. Neeley, Attorney for Appellee

JUDGE JOHN D. LUTHY authored this Opinion, in which
JUDGES DAVID N. MORTENSEN and RYAN D. TENNEY concurred.

LUTHY, Judge:

¶1   Amber Klein and Melvin James Klein divorced after twenty-seven years of marriage. Melvin[1] challenges several aspects of the district court's alimony award, several of the court's evidentiary decisions, and the court's distribution of marital property. Melvin's claims are either unpreserved, inadequately briefed, unpersuasive because of a failure to marshal relevant evidence, or otherwise obviously without merit. We therefore reject his claims, affirm the court's decree, grant Amber's request for attorney fees under rule 33 of the Utah Rules of Appellate

---

1. Because the parties share a surname, we refer to them by their given names, with no disrespect intended by the apparent informality.

Procedure, and remand the matter to the district court for a determination of those fees.

BACKGROUND

*The Marriage and Its Deterioration*

¶2 During Amber and Melvin's marriage, "Melvin was the primary, and for the most part, sole income provider for the family." While the parties had young children, "both Melvin and Amber were agreeable and supportive that Amber not have [full-time] employment; but instead, that she primarily care for their children." However, as the children became older and began reaching adulthood, Melvin "felt his contributions to the marriage were unfairly burdensome compared to Amber's," and he began demanding "that Amber make a fair contribution to the marriage." He "insisted that Amber's offsetting contribution to the marriage should be that she either get a job and bring in income or, in the alternative, willingly engage with him in regular anal sexual intercourse."

¶3 Amber "was not agreeable to having anal intercourse with Melvin"—both "because she felt it was morally wrong" and because she had suffered "[f]or a substantial period of time" from "debilitating" colorectal ailments that made anal intercourse particularly painful. She contended that these ailments prevented her from "obtain[ing] or maintain[ing] regular and consistent employment." Melvin "told [Amber] that . . . because she was not working, if she did not regularly engage in anal sexual intercourse with him, the marriage was over." Amber refused. And in December 2019, she filed for divorce.

¶4 Melvin moved out of the marital home on "approximately January 1, 2020," but continued to pay the mortgage and utility bills for eight months. After a failed mediation in September 2020, he told Amber "he could no longer afford to pay her any financial support." Thereafter, Melvin provided no financial support to

Amber and made no mortgage or other payments toward the marital home.

*The Trial*

¶5 The divorce action proceeded to a bench trial that occurred over five nonconsecutive days, beginning in December 2022 and ending in May 2023. "The most substantial disputes between the parties surrounded Melvin's demands for anal sexual intercourse, Amber's physical condition, and Amber's lack of employment." Other issues included Melvin's income and the value of the marital home. Amber's witnesses included her treating physician (Doctor), a home appraiser (Appraiser), and Amber herself. Melvin's witnesses included a colorectal surgeon (Expert), a vocational rehabilitation counselor (Counselor), one of Melvin's coworkers (Coworker), the plant superintendent from Melvin's work (Superintendent), Amber, and Melvin himself.

¶6 Amber testified about the history of the marriage. She also testified about her health. She explained that her medical condition was at its worst in 2015. At that time, she said, she would sometimes "be down for four days" after a bowel movement. After 2015, she explained, her condition progressively improved until about 2020. She stated that in 2020 her condition "leveled out" and that it had not "really changed since then." At the time of trial, she testified, she was still "unable to do anything" after bowel movements and would therefore "deliberately not eat for as long as possible"—sometimes going days without food—in order to avoid going to the bathroom.

¶7 Amber confirmed that after Melvin moved out, he continued paying the mortgage and utilities on the marital home until about September 2020 but provided no support thereafter. She testified that in early 2022, she received notification that the bank was going to foreclose on the home. She explained that this prompted her to borrow $25,000 from a friend and to use $18,250 of the borrowed funds to "save the home from foreclosure." She also testified that as of the time of trial, there were problems with

the home, including leaks in the roof, a broken furnace, and issues with electrical outlets.

¶8     Finally, Amber detailed her monthly expenses, and she testified that after June 2020 she applied for several jobs but received no employment offers.

¶9     Doctor testified that he examined Amber in 2020, and he read from a letter he had written following that examination. In it, he said that her medical condition was severe and that she had told him "the pain [was] bad enough that she ha[d] to [lie] down for up to eight hours after a bowel movement." He also wrote that some "healing . . . had taken place" but that it "look[ed] like it [was] as good as it [was] going to get." Doctor also read from a medical assessment record that stated "there [was] no surgery that [could] repair [her] anatomy." Doctor then testified that there was "a significant mental health impact related to" Amber's condition, namely, post-traumatic stress disorder (PTSD). Ultimately, Doctor opined that Amber would have difficulty working due to her "rectal pain and her mental status."

¶10    Appraiser testified about the value of the marital home. He explained that he conducted an inspection and appraisal of the marital home in August 2020. He stated that, during his inspection, he saw that the roof leaked and the asphalt shingles needed to be replaced. He also testified that there were electrical issues and that the home's deck "was not stable." He opined that the home's value in August 2020 was $226,000, and his appraisal to that effect was admitted over Melvin's objection on relevancy grounds.

¶11    After Amber presented her case, Melvin presented his, during which he called Expert to testify. Expert had not personally examined Amber, and he therefore testified based on his review of Amber's medical records and a photograph of her condition. Expert testified that he had been a colorectal surgeon for ten years and had "never had a patient with such severe symptoms" as Amber's. He said that a condition like Amber's

"can consume the life of a person, to the point the person dreads eating, having bowel movements, or doing any type of normal activity." Expert opined, however, that Amber's condition could be surgically repaired to the point that Amber could "kind of go back to a normal life." He further opined that Amber would be able to return to work within four to six weeks after surgery if there were no complications. Expert testified that he had "never diagnosed anyone with PTSD" and that if he were to treat anyone with "any issues . . . like a long-term trauma," he would refer the patient to a psychiatrist or other mental health professional.

¶12 Melvin called Counselor to opine on Amber's ability to work. Counselor identified several entry level jobs near where Amber lived that matched Amber's qualifications. The starting pay for these jobs was about $12 an hour.

¶13 Coworker and Superintendent testified as well. Coworker testified that he and Melvin worked together for about eight years until Melvin moved into a lesser-paid position due to their company's restructuring. Superintendent testified that after Melvin moved into the lesser-paid position (which was three years prior to trial), higher-paying jobs for which Melvin was qualified—some paying upwards of $28 an hour—had come open in the same company, but Superintendent did not know whether Melvin had applied for any of them.

¶14 Finally, Melvin testified. He explained that he was demoted when his employer restructured its organization and that at the time of trial, he was making $20.65 an hour. He confirmed that he had not applied for any positions that came open after his demotion. He also detailed his monthly expenses.

*The District Court's Rulings*

¶15 Following trial, the court issued findings of fact and conclusions of law. It found that "[b]ased on the severity of Amber's physical condition, together with her accompanying mental health elements, it was reasonable that Amber [had] not

[sought], obtain[ed], or maintain[ed] full[-]time employment." It further found, however, "that with proper action on her part, [Amber could] obtain the needed medical diagnosis, treatment[,] and surgery" and that "following a reasonable recovery period, she [would] be capable of entering the marketplace and obtaining full[-]time employment."

¶16 Accordingly, the court determined that Amber should be given one year to obtain treatment and find employment. It then imputed to Amber a wage of $12 an hour, for a gross monthly income of $2,080 and a net monthly income after taxes of $1,601, beginning one year after entry of the divorce decree. And it imputed to Amber a wage of $17 an hour, for a gross monthly income of $2,946 and a net monthly income of $2,268, beginning three years after entry of the divorce decree. The court found Amber's reasonable monthly expenses to be $3,639.

¶17 As to Melvin, the court found that after the parties separated in 2020, Melvin's income was $3,818 per month. But based on Melvin's testimony, Coworker's testimony, and Superintendent's testimony, the court found that "Melvin ha[d] passed up, and/or voluntarily chosen not to pursue[,] higher paying jobs that [had since become] available at his workplace" that "were well within Melvin's capabilities and would not have appreciably changed his work schedule or location." The court further found that Melvin had "been satisfied to keep his income at his current level" at least in part because of "his desire to avoid paying Amber alimony in a higher amount." Thus, the court imputed to Melvin an hourly income of $28 an hour, for a monthly gross income of $4,853 and a monthly net income of $3,736. It determined his reasonable monthly expenses to be $3,257.

¶18 Based on the parties' respective incomes and expenses, the court determined that Melvin should pay Amber alimony in the amount of $2,059 per month for the first year after entry of the

divorce decree, $1,258.50 per month for the second and third years following entry of the decree, and $925 per month thereafter.[2]

¶19 Next, the court considered the fair market value of the marital home. Amber had asked the court "to deduct $20,000 from the value testified to by [Appraiser]" based on evidence that the home's needed repairs would cost approximately $20,000. But the court noted that "[o]n cross examination, and in argument, Melvin [had] challenged the testimony of [Appraiser], arguing the house should be valued much higher" than the appraised value. Ultimately, the court found the fair market value of the home to be $224,000.

¶20 The court subtracted from the home's $224,000 value the mortgage balance, which was approximately $143,000, as well as the $18,250 Amber had borrowed from her friend to save the home from foreclosure, resulting in an equity amount of $62,750. The court then determined that half of the equity—$31,375—should be awarded to each party.

¶21 Amber had requested a retroactive alimony award for the time between September 2020 (when Melvin stopped paying the mortgage or providing other support) and trial. The court agreed that "Melvin had a legal and equitable obligation to provide support to Amber during that period of time . . . and that he did not do so." But the court noted that if it based alimony for that time on the same monthly amount it had determined to award

---

2. The court calculated these amounts by first subtracting Melvin's monthly expenses from his imputed monthly income, resulting in excess funds of $479 per month. The court then determined that those excess funds should be paid toward Amber's reasonable monthly expenses of $3,639 and that the parties should bear equally Amber's remaining monthly shortfall, which varied depending on her imputed income for the identified periods. Accordingly, the court added $479 to the number representing half of Amber's remaining monthly shortfall for each respective period to arrive at the respective alimony totals.

Amber for the first year following the divorce—$2,059—then the retroactive alimony amount would total $74,124. The court found that such a retroactive alimony award would not be "reasonable or equitable under all the facts in this case" because "Melvin [did] not . . . have the ability to pay that amount." Instead, the court found that a "more equitable, implementable and enforceable order [would be] to award Amber retroactive alimony in an amount [equal to] Melvin's share of the equity in the parties' house"—namely, $31,375.

¶22　The court stated that it would give Melvin six months to pay the retroactive alimony award and that to ensure payment, it would give Amber "an equitable lien in the amount of $31,375 against Melvin's share of equity in the parties' house." If Melvin did not pay the retroactive alimony within six months, Amber would "be allowed to equitably foreclose Melvin's equity in the house." If Melvin timely paid the amount in full, "the equitable lien [would] be deemed satisfied and released," and if Amber was unable to assume or refinance the mortgage, Melvin would be able to force a sale of the home with the proceeds of the sale (minus amounts related to selling the home, paying off the mortgage, and repaying the $18,250 Amber borrowed from a friend) being divided between the parties.

¶23　Finally, as to the division of the parties' personal property, the court initially found that it would be "fair and equitable that Melvin be awarded the highlighted items" listed in an exhibit Melvin had prepared and that Amber be awarded the non-highlighted items listed in the same exhibit, "with the exception that [a particular] .22 rifle [was to] be awarded to Amber." Among the highlighted items that were to go to Melvin were "[Amber's] pearl necklace, tennis bracelet, earrings, long pearl [necklace] (light pastels), [two] Apple iPads, and [two] KitchenAid mixers."

*Amber's Motion for Clarification*

¶24　Before the court issued its decree, Amber filed a motion for clarification. In the motion, she noted that the court's findings of

fact and conclusions of law anticipated awarding Amber's jewelry, two iPads, and two KitchenAid mixers to Melvin, and she "ask[ed] if the [c]ourt intended that [Melvin] be awarded her jewelry, both iPads, and both mixers." Melvin did not respond to Amber's motion, and the court issued an order stating that it had not intended to award the jewelry, both iPads, and both KitchenAid mixers to Melvin. Instead, the court said the jewelry "should be awarded to [Amber] and one each of the iPads and KitchenAid mixers should be awarded to [Melvin]." The court entered a final decree reflecting the determinations made in its prior findings of fact and conclusions of law as modified by its ruling on Amber's motion for clarification.

ISSUES AND STANDARDS OF REVIEW

¶25  Melvin now appeals, raising a number of issues for our review. First, he challenges the district court's alimony award on several grounds. "We review a trial court's award of alimony for an abuse of discretion." *Connell v. Connell*, 2010 UT App 139, ¶ 5, 233 P.3d 836 (cleaned up). "Thus, we will not disturb a trial court's ruling on alimony as long as the court exercises its discretion within the bounds and under the standards we have set and has supported its decision with adequate findings and conclusions." *Id.* (cleaned up). We will overturn the findings supporting an alimony award only if they are clearly erroneous, and "under our clearly erroneous standard, we will disturb a court's factual findings only where the court's conclusions do not logically follow from, or are not supported by, the evidence." *Mintz v. Mintz*, 2023 UT App 17, ¶ 11, 525 P.3d 534 (cleaned up).

¶26  Second, Melvin asserts that the district court erred by relying on improper evidence, including assertedly inadmissible expert testimony. "We review deferentially a district court's decision to admit or exclude evidence, including its determination regarding the admissibility of expert testimony[,] for an abuse of discretion." *Bailey v. Bailey*, 2024 UT App 51, ¶ 22, 548 P.3d 519 (cleaned up).

¶27   Third, Melvin asserts two errors related to the district court's distribution of the parties' property. "In divorce actions, a district court is permitted considerable discretion in adjusting the . . . property interests of the parties, and its actions are entitled to a presumption of validity." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 39, 507 P.3d 385 (cleaned up). "We can properly find abuse of the district court's discretion only if no reasonable person would take the view adopted by the district court." *Id.* (cleaned up).

ANALYSIS

I. Alimony

¶28   Melvin asserts that the district court "arrived at an improper alimony award." He argues that this is so for three reasons: (1) Amber "failed to provide evidence of her need[s]," (2) the district court "over-imputed Melvin to a higher income level," and (3) the district court "imputed Amber to an insufficient income level."[3] We address and reject, in turn, each of these assertions.

A.    Evidence of Amber's Needs

¶29   Melvin first contends that "Amber did not introduce into evidence any documents to back her claim" for alimony and that this "failure to justify and demonstrate her need for alimony is a basis to deny alimony." But Melvin cites no authority for the

---

3. Under separate headings, Melvin also asserts that the district court "did not engage in a sufficient or correct [alimony] analysis" and "should not have awarded retroactive or prospective alimony." But his arguments under these headings essentially restate the arguments made in support of the assertions identified above, and to the extent there are any new arguments under these separate headings, they are inadequately briefed. We therefore do not separately analyze these additional assertions.

proposition that documentary evidence is required to establish a need for alimony. This is likely because "we have previously considered and rejected the assertion that failure to file financial documentation automatically precludes an award of alimony." *Wadsworth v. Wadsworth*, 2022 UT App 28, ¶ 102, 507 P.3d 385 (cleaned up). As we have explained,

> Trial courts are vested with discretion to impute figures for a recipient spouse's needs analysis, even where complete documentation is lacking, as long as there is sufficient evidence to support such imputation. In cases where an alimony claimant fails to provide sufficient documentation, courts may find adequate support for the imputation of particular expenses in, for instance, the opposing party's documentation, or in updated financial declarations supported not by timely disclosed financial documents but instead by the sworn testimony of witnesses.

*Wellman v. Kawasaki*, 2023 UT App 11, ¶ 17, 525 P.3d 139 (cleaned up). These principles are not new. *See, e.g.*, *Dahl v. Dahl*, 2015 UT 79, ¶ 116, 459 P.3d 276 (stating that a district court may impute "a figure to determine [a party's] financial need based either on [the other party's] records of the parties' predivorce expenses or [on] a reasonable estimate of [the party's] needs"); *Munoz-Madrid v. Carlos-Moran*, 2018 UT App 95, ¶ 10, 427 P.3d 420 (noting that because the friend in whose home a divorcing wife had been staying testified about the wife's living expenses, the wife had "provided some information, consistent with her financial declaration, that she had monthly expenses" and holding that it was therefore "reasonable for the court to . . . accept her expenses from her financial declaration" (cleaned up)). And the considerable body of caselaw that runs counter to Melvin's position on this point renders his argument obviously without merit.

¶30 Melvin further implies that—documentation aside—the evidence was insufficient to support the court's findings as to Amber's needs because some evidence in the record contradicts Amber's claimed expenses. However, Melvin makes no effort to marshal the evidence that supports her claimed expenses.

¶31 For example, he notes that in her financial declarations, Amber listed an expense for pet care but that she testified at trial that because one of her dogs "is too old to have any more litters" and "the other one has cancer," the dogs no longer need "special nutrition and extra vitamins and goat's milk and liver and all that kind of stuff" and, thus, that this expense "could just be taken off." Based on this testimony, Melvin would have us overrule the pet care expense portion of Amber's needs as determined by the district court. But Melvin fails to marshal Amber's later testimony that she still had at least one dog at the time of trial, that this dog had a litter of puppies six weeks prior to trial, that this dog had arthritis, and that Amber was still caring for three of that dog's puppies. This evidence supports the court's finding as to the pet care expense portion of Amber's needs.

¶32 Melvin's apparent insufficiency of the evidence argument as a whole amounts to a presentation of "carefully selected facts and excerpts from the record in support of [his] position," *Taft v. Taft*, 2016 UT App 135, ¶ 19, 379 P.3d 890 (cleaned up), with no attempt to—as required for proper marshaling—identify "all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous," *Horning v. Labor Comm'n*, 2023 UT App 30, ¶ 31, 529 P.3d 352 (cleaned up). While a party challenging the sufficiency of the evidence "does not lose its appeal by default simply for failure to marshal," the "traditional principle of marshaling [remains] a natural extension of an appellant's burden of persuasion," and "a party challenging a factual finding or sufficiency of the evidence will almost certainly fail to carry its burden of persuasion on appeal if it fails to marshal." *C.R. England Inc. v. Labor Comm'n*, 2024 UT App 170, ¶ 28, 561 P.3d 213 (cleaned up), *cert. denied*, 564 P.3d 958 (Utah 2025). Such is the case here. By failing to marshal

the evidence in support of the district court's findings as to Amber's needs, Melvin has not carried his burden to persuade us that those findings were clearly erroneous. Thus, we do not disturb the court's findings as to Amber's needs.

B.     Melvin's Income

¶33     Melvin next asserts that the district court imputed too high an income to him when making its alimony determination. He does this by, again, presenting only "carefully selected facts and excerpts from the record in support of [his] position," *Taft*, 2016 UT App 135, ¶ 19 (cleaned up), with no attempt to identify "all relevant evidence presented at trial which tends to support the findings and demonstrate why the findings are clearly erroneous," *Horning*, 2023 UT App 30, ¶ 31 (cleaned up). The district court heard evidence that multiple positions for which Melvin was qualified and which paid around $28 per hour became available with Melvin's longtime employer during the years the divorce was pending yet Melvin applied for none of them. Melvin does not marshal this evidence in support of the income figure the district court imputed to him, let alone show why that evidence was insufficient. Accordingly, we decline to disturb the court's imputation of income to Melvin based on a wage of $28 an hour.

¶34     Melvin challenges the district court's imputation of income to him based on the additional assertion that the "court made up its mind" to impute income to him "before even receiving the evidence to [support such imputation] in the first place." The claim that the court made up its mind before receiving any evidence on a particular issue amounts to an assertion of bias.[4] Melvin says that this bias "was evidenced in multiple statements

---

4. Melvin did not preserve his claim of bias. We nevertheless choose to address it. *See State v. Kitches*, 2021 UT App 24, ¶ 28, 484 P.3d 415 ("If the merits of a claim can easily be resolved in favor of the party asserting that the claim was not preserved, we readily may opt to do so without addressing preservation." (cleaned up)).

. . . accusing Melvin of not providing his paystubs—even though Melvin timely and correctly provided updated paystubs." We are not persuaded.

¶35    For starters, before the court mentioned Melvin's paystubs, it had already heard the key imputation evidence on which it ultimately relied—namely, Superintendent's testimony that multiple positions for which Melvin was qualified and which paid around $28 per hour became available with Melvin's longtime employer during the years the divorce was pending and Superintendent was unaware of Melvin applying for any of those positions. Thus, it is inaccurate to say that the court's statements about Melvin's paystubs indicate that the court made up its mind to impute income to Melvin before it received evidence to support the imputation of income.

¶36    "Moreover, parties claiming bias must demonstrate that the alleged bias stems from an extrajudicial source." *Dahl v. Dahl*, 2015 UT 79, ¶ 49, 459 P.3d 276. "Neither bias nor prejudice refers to the attitude that a judge may hold about *the subject matter* of a lawsuit." *State v. Munguia*, 2011 UT 5, ¶ 17, 253 P.3d 1082 (cleaned up). Here, the court heard evidence that Melvin had intentionally remained underemployed in the years leading up to trial. At that point, it questioned why Melvin was relying on paystubs from 2020 (three years prior to trial) and suggested that if Melvin wanted to enhance his credibility regarding his income, it would be better for him to "show his current paycheck stub." Later, when Melvin was cross-examined as to why he had not provided a paystub that was current as of the time of trial, his counsel objected based on the fact that Melvin had provided paystubs "all the way until the pretrial disclosure date." The court acknowledged that Melvin had provided paystubs up through the final pretrial disclosure deadline but noted that Melvin's income was "a critical issue" and that it believed Melvin was "doing all he [could] to keep his income down." Concurrently, the court noted its assessment that Amber was "doing all she [could] to not have a job" and that "[b]oth sides

ha[d] not been credible" on the issue of their income potentials. The court then asked Melvin if he had provided his current paystub to his counsel, and Melvin said that he had. Melvin's counsel acknowledged that he "probably [did] have" a more current paystub for Melvin and "could forward [it] over . . . as an exhibit," which he then did. We simply see in the foregoing exchanges no evidence of bias toward a particular party based on an extrajudicial source, and we remind counsel that "[l]awyers shall not, without an adequate factual basis, attribute to . . . [a] court improper motives, purpose, or conduct." Utah R. Jud. Admin. 14-301(3).

C.     Amber's Income

¶37     Melvin asserts that the district court made a "clearly erroneous" decision when it imputed to Amber no income for the first year following entry of the divorce decree, income of $1,601 per month for the second and third years following entry of the decree, and income of $2,268 per month thereafter. But Melvin wholly fails to engage with the court's reasoning behind that decision. Nor does he marshal the evidence in support of the findings that support the court's reasoning.

¶38     Melvin's appellate burden of persuasion "necessarily require[d] [him] to address the reasoning and basis of the district court's ruling and to explain why that court got it wrong." *Cottam v. IHC Health Services Inc.*, 2024 UT App 19, ¶ 15, 544 P.3d 1051 (cleaned up). By "not meaningfully engag[ing] with the district court's reasoning," Melvin has "fall[en] short of demonstrating any error on the part of the district court." *Big Game Forever v. Peterson*, 2024 UT App 78, ¶ 19, 551 P.3d 411 (cleaned up). We therefore do not disturb the district court's determinations as to Amber's income.

¶39     Because we reject each of Melvin's arguments asserting error in the district court's alimony calculation, we affirm the court's alimony order.

II. Evidence

¶40 Melvin next argues that the district court "permitted testimony . . . it should not have," namely (1) Doctor's expert opinions, (2) Appraiser's valuation of the marital home, and (3) Coworker's and Superintendent's purportedly expert testimony elicited on cross-examination. We address and reject, in turn, each of these arguments as well.

A. Doctor's Testimony

¶41 Melvin asserts that the court should have excluded Doctor's expert testimony. But Melvin does not adequately brief this issue.

¶42 Melvin quotes the expert disclosure requirement of rule 26(a)(4) of the Utah Rules of Civil Procedure and asserts that the district court erred by "adopt[ing] [Doctor's] expert opinions, even though he was not designated as an expert, and where Amber conceded that he was not being used as an expert." Melvin fails, however, to either acknowledge or address the fact that nearly ten months before trial, Amber actually served on Melvin (apparently at his insistence) a Notice of Expert Witness, which disclosed Doctor as an expert witness and contained, among other things, the letter from Doctor discussed above, *see supra* ¶ 9, in which Doctor opined that Amber had "healing that [would] need to occur through counseling and emotional healing over time." Additionally, while Amber's counsel said at trial that Doctor would testify "not as an expert," Amber's counsel also said that Doctor would testify regarding "what his diagnosis was." And medical diagnosis testimony is generally expert testimony. *See Beard v. K-Mart Corp.*, 2000 UT App 285, ¶ 16, 12 P.3d 1015 ("The diagnosis and potential continuance of a disease are medical questions to be established by physicians as expert witnesses and not by lay persons." (cleaned up)). Because Melvin does not address Amber's pretrial disclosure of Doctor as an expert or her in-trial declaration that Doctor would testify regarding his diagnosis of Amber, Melvin does not adequately brief his

assertion of error based on inadequate disclosure of Doctor's expert testimony. *See State v. Jaeger*, 1999 UT 1, ¶ 31, 973 P.2d 404 (stating that an appellate "court is not a depository in which the appealing party may dump the burden of argument and research" and that adequate briefing "requires not just bald citation to authority but development of that authority and reasoned analysis based on that authority" (cleaned up)).

¶43 Melvin also cites rule 702(b) of the Utah Rules of Evidence for the proposition that an expert may opine only if there "is a threshold showing that the principles or methods that are underlying the testimony are reliable, based upon sufficient facts or data, and have been reliably applied to the facts." And he quotes *State v. Jarrell*, 608 P.2d 218 (Utah 1980), for the related proposition that an "expert may not give an opinion which represents a mere guess, speculation, or conjecture." *Id.* at 230. He then merely states that Doctor "testified that Amber would have difficulties returning to work with PTSD." Melvin provides no analysis demonstrating why Doctor's PTSD diagnosis was speculation or why the principles underlying that diagnosis were not reliable. And he further fails to provide any analysis showing why Doctor's opinion that Amber would have difficulty returning to work due to her PTSD was unreliable or speculative. Thus, Melvin's rule 702(b) challenge to Doctor's PTSD-related testimony is also inadequately briefed. *See Jaeger*, 1999 UT 1, ¶ 31.

B.    The Appraisal

¶44 Melvin next asserts that the district court should not have relied on Appraiser's appraised value of the marital home from August 2020. At trial, Melvin objected to admission of the appraisal on relevancy grounds. In his brief, Melvin places his argument regarding the appraisal under the heading that the district court "permitted testimony when it should not have," and he asserts that the district court "abused its discretion by utilizing [an] outdated and unreliable appraisal." To the extent that Melvin thus means to challenge the admissibility of the appraisal, his argument amounts to a bald assertion unaccompanied by

authority or analysis. Melvin's evidentiary challenge to the appraisal is therefore inadequately briefed.[5] *See id.*

¶45 Melvin's argument regarding the appraisal also challenges the sufficiency of the evidence in support of the court's finding as to the value of the marital home. Specifically, Melvin asserts that the appraisal "failed to provide an adequate basis for valuing the home." In support of this assertion, he cites Appraiser's testimony that the August 2020 appraised value of the marital home would not represent the home's value as of the time of Appraiser's trial testimony—March 2023—because the comparisons on which the appraisal was based were by then "invalid" and because the market is always changing. However, Melvin fails to marshal Appraiser's other relevant testimony, including his explanation that "[t]he textbook answer" to the question of how long an appraisal is valid is that it "is good for [only] one day in time" yet banks will accept appraisals in rural areas for up to one year for financing purposes. He also fails to marshal the evidence showing that the home needed $20,000 in repairs. Furthermore, he cites no authority to support the notion that, though a dated appraisal is admissible, it is an insufficient evidentiary basis on which to base a finding of value. Thus, Melvin's alternative appraisal argument is also inadequately briefed. *See id.*

C.     Lay Witnesses

¶46 Melvin's final evidentiary challenge is to the district court's admission of Superintendent's and Coworker's purportedly expert testimony—elicited on cross-examination—"even though [neither] of them [was] disclosed" as an expert. This issue was not preserved for appeal. While Melvin objected to some of Superintendent's testimony on the basis that it was "speculation,"

---

5. The evidentiary challenge is also wrong on the merits. *See Ellyson v. Ellyson*, 265 N.E.3d 670, 677 (Ohio Ct. App. 2025) ("[T]he court correctly found [the appellant's] argument that the appraisals [of the marital home in a divorce action] were outdated went to the weight to be given the evidence, not admissibility.").

he did not object to either witness's testimony on the basis that the witness had not been properly disclosed as an expert. "If a party makes an objection at trial based on one ground, this objection does not preserve for appeal any alternative ground for objection." *State v. Crabb*, 2011 UT App 440, ¶ 2, 268 P.3d 193 (per curiam) (cleaned up). "It is well established that we will not address the merits of an unpreserved issue absent a showing that an exception to the preservation rule applies." *State v. Centeno*, 2023 UT 22, ¶ 57, 537 P.3d 232. Melvin does not claim that any exception to the preservation rule applies here.[6] Accordingly, we do not address the merits of his argument on this issue.

¶47 Apart from the admissibility of Superintendent's and Coworker's purportedly expert testimony, Melvin also argues that the "court's use of these witnesses" to impute income to Melvin of $28 per hour "was an abuse of discretion and error" because "it disregarded testimony indicating that Melvin was not voluntarily underemployed and that he was relegated to the current position he was at." We have already addressed Melvin's argument regarding the district court's imputation of income to him. *See supra* ¶ 33. We noted that Melvin had failed to marshal the evidence supporting the court's imputation of income to him. *See supra* ¶ 33. And Melvin makes no more attempt in the "lay witness" portion of his brief to marshal the evidence in support of the findings that support the court's imputation analysis than he did in the portion of his argument addressed above. Nor does he present any argument that persuades us the court's imputation

---

6. Utah courts have "recognized three distinct exceptions to preservation: plain error, ineffective assistance of counsel, and exceptional circumstances." *State v. Johnson*, 2017 UT 76, ¶ 19, 416 P.3d 443. In ordinary civil cases, however, this list is shorter by two: ineffective assistance is generally "a claim not afforded in civil cases," *Thomas v. Hillyard*, 2019 UT 29, ¶ 13 n.11, 445 P.3d 521, and "plain error review is not available in ordinary civil cases unless expressly authorized by rule," *Kelly v. Timber Lakes Prop. Owners Ass'n*, 2022 UT App 23, ¶ 44, 507 P.3d 357.

determination was outside the bounds of its considerable discretion.

¶48 Because Melvin's challenges related to Doctor's expert testimony, the appraisal, and Superintendent's and Coworker's purportedly expert testimony are each inadequately briefed, unpreserved, or obviously without merit, we do not disturb the district court's evidentiary rulings, its findings that are founded on the challenged evidence, or its discretionary determinations that are based on those findings.

## III. Allocation of Property

¶49 Melvin raises two final issues. First, he argues that the district court "improperly awarded the [marital] home to Amber with all the equity." Second, he contends that the court "improperly allocated personal property." These arguments are also unavailing.

### A. Allocation of the Marital Home

¶50 Melvin's full argument in his principal brief in support of the assertion that the district court improperly awarded the marital home to Amber is as follows:

> Given the discussion [regarding the appraisal], the trial court is left with one option regarding the home: ordering the home to be sold and the proceeds to be divided between the parties. A sale will most accurately reflect its market value, as potential buyers would bid on the house at market value. This is the default best way to determine the value of the home, as it will sell to the highest bidder in a competitive market. This option was not selected by the trial court, who decided to set an arbitrary and unreliable value on the home. This was especially punitive as the trial court effectively removed Melvin's entire interest in the home by

> awarding Amber a $31,375 judgment, and extinguishing Melvin's equity. By using an outdated appraisal, the trial court abused its discretion, especially when it could just order the sale of the home. Additionally, the alimony judgment, which is addressed above, should be removed as a judgment lien against Melvin, and the proceeds should be equally divided between the parties.

(Internal cross-reference and record citation omitted.)

¶51 This argument repeats the unsupported assertions we already rejected regarding admissibility of the appraisal and the ability of the appraisal to support the court's finding as to the value of the marital home. *See supra* ¶¶ 44–45. The remainder of this argument rests largely on the assertion that the district court effectively and inequitably deprived Melvin of his entire interest in the home. But the court did not deprive Melvin of his interest in the home; instead, it granted Amber a lien against Melvin's interest in order to guarantee his payment of the retroactive alimony award. If Melvin timely paid the retroactive alimony award, he would "maintain[] his one half ownership interest in the house free and clear of Amber's equitable lien," and if Amber was unable to timely assume or refinance the mortgage, the home would be ordered sold and the proceeds (minus amounts related to selling the home, paying off the mortgage, and repaying the $18,250 Amber borrowed from a friend) divided between the parties. By containing only unsupported legal assertions and inaccurate factual representations, Melvin's argument regarding the court's valuation and distribution of the marital home is inadequately briefed.

¶52 Melvin's argument is also wrong on the merits. *See generally Ramos v. Cobblestone Centre*, 2020 UT 55, ¶ 47, 472 P.3d 910 ("It is within our discretion to reach the merits of an argument that is inadequately briefed . . . ." (cleaned up)). "In divorce actions, a district court is permitted considerable discretion in

adjusting the financial and property interests of the parties, and its actions are entitled to a presumption of validity." *Dutcher v. Dutcher*, 2025 UT App 21, ¶ 14, 566 P.3d 48 (cleaned up). Regarding a district court's considerable discretion in adjusting the property interests of divorcing parties, we have further explained,

> We can properly find abuse of the district court's discretion only if no reasonable person would take the view adopted by the district court, that is, if a misunderstanding or misapplication of the law resulted in substantial and prejudicial error, if the court's factual findings are clearly erroneous, or if the award is so seriously inequitable as to manifest a clear abuse of discretion.

*Id.* (cleaned up). Here, the court considered evidence of an appraised value, Melvin's objections to that value, and evidence of significant necessary repairs when valuing the marital home. And in granting Amber a lien against Melvin's interest, the court provided protection to Amber that was reasonable in light of Melvin's previous refusal to pay the mortgage or any other support. Moreover, the court's action of requiring sale upon Amber's inability to assume the mortgage or refinance the home protected Melvin's interest. A reasonable person could have taken the approach the district court did, and we therefore affirm the court's valuation and distribution of the marital home.

## B. Allocation of Personal Property

¶53 Finally, Melvin asserts as follows in his principal brief:

> The trial court should have equally divided the [parties' personal] property, as Utah law indicates. The trial court did not do this. After trial, Amber requested additional items be awarded to her after

the trial court had already made its ruling.[7] She did not file a proper filing as required under Rule 59. The trial court then proceeded to award Amber with additional marital items, which should have been divided equally between the parties. As such, this issue should be remanded for proper division between the parties, especially where the claims were not raised at trial.

(Internal cross-references omitted.)

¶54   This argument, too, is inadequately briefed. For one thing, Melvin does not explain why Amber's motion was not proper under rule 59 of the Utah Rules of Civil Procedure.[8] Moreover, as to the jewelry, he does not grapple with our caselaw that says a "fair and equitable property distribution is not necessarily an equal distribution." *Clarke v. Clarke*, 2012 UT App 328, ¶ 9, 292 P.3d 76 (cleaned up).

¶55   Instead, Melvin argues in his reply brief that because "the trial court indicated" in its original findings of fact and conclusions of law that "it had already equitably divided the parties' assets," the "newly awarded assets had to have been inequitably divided when they were all given to Amber." But the identified items were not all given to Amber—an iPad and a KitchenAid mixer were given to Melvin. More importantly, the

---

7. As noted above, *see supra* ¶ 24, Amber's motion described those items as "her jewelry, both iPads, and both mixers."

8. Even if Amber's motion for clarification may have been improper under rule 59 (an issue we do not decide), it was plainly proper under rule 60 of the Utah Rules of Civil Procedure. Rule 60 allows for motions to correct mistakes in orders or proceedings if those motions are filed within ninety days of the relevant order or proceeding, *see* Utah R. Civ. P. 60(b)(1), (c), and Amber's motion asking the court to clarify whether a mistake had been made here was timely filed.

court's clarification that it never intended to give all the identified items to Melvin thoroughly undermines his assertion that the original distribution reflected a determination by the district court that the original distribution was the only equitable option.

¶56 In sum, Melvin's argument in his principal brief regarding the district court's distribution of the parties' personal property is inadequately briefed, and the argument in his reply brief plainly lacks merit. Accordingly, we affirm the district court's distribution of the parties' personal property.

## IV. Attorney Fees

¶57 Amber requests an award of attorney fees pursuant to rule 33 of the Utah Rules of Appellate Procedure. Under rule 33, if we determine that an appeal "is either frivolous or for delay, [we] will award just damages, which may include . . . reasonable attorney fees, to the prevailing party." Utah R. App. P. 33(a). "The court may order that the damages be paid by the party or by the party's attorney." *Id.* Our supreme court has explained,

> The imposition of such a sanction is a serious matter and only to be used in egregious cases, lest the threat of such sanctions should chill litigants' rights to appeal lower court decisions. Sanctions are appropriate for appeals obviously without merit, with no reasonable likelihood of success, and which result in the delay of a proper judgment.

*Redd v. Hill*, 2013 UT 35, ¶ 28, 304 P.3d 861 (cleaned up).

¶58 This is a case where an award of fees under rule 33 is appropriate. Melvin raises at least eight discrete issues on appeal, yet his arguments are either unpreserved, inadequately briefed, void of marshaling, obviously without merit, or some combination of the above. In short, the appeal had no reasonable likelihood of success. Moreover, it has resulted in a delay of the properly entered judgment, which includes an order for Melvin

to pay $31,375 in retroactive alimony in a situation where his failure to timely do so would seriously jeopardize Amber's ability to assume or refinance the mortgage on the marital home. For these reasons, we grant Amber's rule 33 request and order Melvin to pay Amber's reasonable attorney fees incurred in defending this appeal. We remand this matter to the district court for a determination of those fees.

## CONCLUSION

¶59 For the foregoing reasons, the district court's divorce decree is affirmed, Melvin is ordered to pay Amber's reasonable attorney fees incurred in defending this appeal, and the matter is remanded to the district court for a determination of those fees.

––––––––––